**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO.: _____

MARKEL AMERICAN INSURANCE COMPANY

Plaintiff,

vs.

A1C HOLDINGS, LLC, JAMES LETKO,
STEVEN KING, and KATHERINE PETERSON,

Defendants.

/

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff, Markel American Insurance Company ("Plaintiff" or "MAIC"), by and through

its attorneys, TRESSLER, LLP and MORAN KIDD, P.A., respectfully alleges and sets forth as

follows:

**NATURE OF ACTION**

1.       This is an action for declaratory relief pursuant to Rule 57 of the Federal Rules of

Civil Procedure, 28 U.S.C. §§ 2201 and 2202, and Chapter 86 of the Florida Statutes.

2.       Plaintiff seeks a declaration that Plaintiff owes no insurance coverage obligations

to Defendants A1C Holdings ( "A1C Holdings"), James Letko, Steven King, and Katherine

Peterson (collectively referred to herein as the "Defendants"), under For Profit Management

Liability Policy No. ML823205 (the "Policy") for the period March 25, 2017 to April 11, 2018

(the "**Policy Period**")[1], in connection with a September 26, 2019 indictment in the United States

District Court of the Eastern District of Michigan ("Indictment").

---

[1] Bolded terms are as defined in the Policy.

## INTRODUCTION

3.      Upon information and belief, A1C Holdings and/or **Subsidiaries** of A1C

Holdings participated in the Medicare Part D Program[2] as drug plan sponsors and were parties to

provider agreements (directly or indirectly) with one of more PBMs.

4.      During the period May 2017 to September 2019, A1C Holdings provided notice

to MAIC under the Policy of matters involving various **Insureds'** alleged involvement in

pharmaceutical services and the Medicare Part D Program.  Specifically, in May 2017, A1C

Holdings provided notice to MAIC under the Policy of search and seizure warrants issued on

May 2, 2017 and May 3, 3017, by federal judges sitting in the U.S. District Court for the Eastern

District of Michigan and the Southern District of Florida to search and seize property from All

American Medical Pharmacy ("AAMP") and All American Medical Supplies ("AAMS) (the

"Search and Seizure Warrants").  Upon information and belief, AAMP and AAMS are

**Subsidiaries** of A1C Holdings and thus **Insureds** as defined in the Policy.  An affidavit in

support of the Search and Seizure Warrants alleged, among other things, that certain

**Subsidiaries** of A1C Holdings engaged in multiple mechanisms to defraud the Medicare Part D

Program.  In October 2017, A1C Holdings also provided notice of a civil forfeiture complaint

filed on September 29, 2017 in the U.S. District Court for the Eastern District of Michigan to

---

[2] Upon information and belief, the Medicare program ("Medicare") is a federal health care program providing benefits to persons who are 65 years of age or older or disabled.  Upon information and belief, Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services and individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."  Upon information and belief, the Medicare Part D program is a prescription drug benefit program that subsidizes costs of prescriptions drugs and prescription drug insurance premiums for Medicare beneficiaries. Upon information and belief, Medicare drug plans are operated by private health care insurance companies, referred to as drug plan "sponsors" and Medicare compensates Medicare drug plan sponsors by paying the sponsors a monthly fee for each Medicare beneficiary of the sponsor's plans.  Upon information and belief, Pharmacy benefit managers ("PBMs") manage prescription drug benefits provided by Medicare through Medicare drug plan sponsors. Upon information and belief, PBMs receive, adjudicate, and pay claims on behalf of the health care benefit programs.  Upon information and belief, after a pharmacy dispenses a prescription drug to a beneficiary, the pharmacy submits a claim to the PBM and the PBM, on behalf of the health care benefit program, reimburses the pharmacy.

seize the bank accounts that were the subject of the seizure warrants (the "Civil Forfeiture Complaint").

5.    MAIC evaluated the availability of coverage for the Search and Seizure Warrants and the Civil Forfeiture Complaint under the Policy.  By letter dated November 28, 2017, MAIC denied coverage for the Search and Seizure Warrants and Civil Forfeiture Complaint. Specifically, MAIC concluded that the Search and Seizure Warrants do not constitute **Claims** under the Policy because they do not identify an **Insured Person** in the captions and were not served upon any **Insured Person** as an individual against whom a proceeding may be commenced.  MAIC also denied coverage for the Civil Forfeiture Complaint on the basis that it is not a **Claim** made against the **Insured**.  Specifically, the Civil Forfeiture Complaint named various bank accounts as defendants *in rem* and did not name the **Insured** or any **Insured Person** as a defendant.

6.    In October 23, 2017, A1C Holdings provided notice to MAIC under the Policy of order summaries issued on September 19, 2017 by the North Carolina Board of Pharmacy suspending the pharmacy permits for AAMP, AAMS, Saracare LLC d/b/a All-American Medical ("Saracare")[3] (the "Order Summaries").   MAIC evaluated the availability of coverage for the Order Summaries under the Policy.   By letter dated May 24, 2018, MAIC denied coverage for the Order Summaries on the basis that they do not constitute a **Claim** under the Policy.  Specifically, MAIC concluded that the Order Summaries were issued as an "emergency action" in the course of an investigation and were not "administrative or regulatory proceeding[s] against an **Insured** commenced by such **Insured's** receipt of a notice of charges or similar document" or "[a] civil, criminal, administrative or regulatory investigation of an **Insured**

---

[3] Upon information and belief, Saracare is a **Subsidiary** of A1C Holdings.

3

Person[.]"   Accordingly, MAIC concluded that the Order Summaries do not constitute a **Claim** under the Policy and denied coverage on that basis.

7.       On December 4, 2018, January 8, 2019, February 12, 2019 and July 11, 2019, A1C Holdings provided written notice of target letters issued by the U.S. Department of Justice ("USDOJ") to Steven King, Katherine Peterson, Emanuel Holmes, Leah Moyer, and James Letko (the "Target Letters").   MAIC concluded that Steven King, Emanuel Holmes, Katherine Peterson, and James Letko qualify as **Insured Persons**, and accepted the Target Letters as a **Claim** under the Policy.[4]  MAIC provided a defense to Steven King, Emanuel Holmes, Katherine Peterson, and James Letko in connection with the Target Letters, subject to a reservation of rights.

8.       On September 27, 2019, A1C Holdings provided notice to MAIC under the Policy of the Indictment, which indicts the following individuals: (1) James Letko;(2) Steven King; (3) Rami Lazeki; (4) Patricia Flannery; and (5) Katherine Peterson (collectively referred to as the "Criminal Defendants"). The Indictment charges the Criminal Defendants with Count 1: Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349, and charges Lazeki with Counts 2-6: Health Care Fraud, in violation of 18 U.S.C. §§ 1347 and 2. Specifically, the Indictment alleges that the Criminal Defendants submitted false and fraudulent claims to Medicare and Medicare drug plan sponsors on behalf of subsidiary pharmacies in an amount exceeding $80 million.  The Indictment also alleges, among other things, that the Criminal Defendants refilled medically unnecessary prescription drugs and diabetic testing supplies that were shipped without patient consent, redirected prescriptions without patient

---

[4] MAIC did not accept the target letter addressed to Moyer as a **Claim** on the basis that Moyer is not an **Insured Person**.

consent, and did not collect co-pays from Medicare beneficiaries in order to induce them to accept refills of expensive medication and diabetic testing supplies without consent.

9.      In light of the allegations contained in the Indictment, MAIC evaluated the availability of coverage for the Indictment under the Policy.  By letter dated November 1, 2019, MAIC issued a letter denying coverage for the Indictment on the basis that coverage is excluded pursuant to the Policy's endorsement, titled The Exclusion – Broad Professional Liability Endorsement (the "Professional Services Exclusion").   Pursuant to the Professional Services Exclusion, coverage is excluded for **Claims** based upon, arising out of, or in any way involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services.  MAIC concluded that the Indictment is based upon and arises out of actual or alleged errors, misstatements, misleading statements, acts, omissions, neglect, or breach of duty in connection with the rendering or failure to render professional services, including the dispensing of medicinal drugs and testing supplies.   Accordingly, MAIC denied coverage for the Indictment on that basis.

10.      A1C Holdings has objected to MAIC's coverage position that coverage for the Indictment is excluded under the Policy pursuant to the Professional Services Exclusion.   MAIC has agreed to continue to defend the **Insureds** named in the Indictment under a reservation of rights, including the right to seek reimbursement of **Claim Expenses**, pending resolution of this coverage dispute.

## PARTIES

11.      Plaintiff is a corporation existing under the laws of the State of Virginia and is a citizen of Virginia.

12.     Upon information and belief, A1C Holdings is a limited liability company existing under the laws of the State of Delaware, with its principal place of business in the State of Florida.

13.     Upon information and belief, James Letko is a resident of the State of New Jersey.

14.     Upon information and belief, Steven King is a resident of the State of Florida.

15.     Upon information and belief, Katherine Peterson is a resident of the State of New Jersey.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) and 1332(c)(1) because there is complete diversity of citizenship between the Plaintiff and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over A1C Holdings because A1C Holdings is a citizen of the State of Florida.  Upon information and belief, A1C Holdings is a Delaware limited liability company with a principal place of business in the State of Florida.  Upon information and belief, the members of A1C Holdings are A1C Investco, Inc., which is incorporated in Delaware and has a principal place of business in the State of California; and B1C, LLC, which is incorporated in the State of Delaware and has a principal place of business in the State of New Jersey.  Upon information and belief, B1C, LLC's sole member is Geo Signature, Inc., which is incorporated in Seoul, Republic of Korea.  Upon information and belief, A1C Holdings is a citizen of Delaware, Florida, California, New Jersey, and the Republic of Korea pursuant to 28 U.S.C. § 1332(c)(1).

18.     The Court has personal jurisdiction over Steven King, who, upon information and belief, was the Chief Compliance Officer ("CCO") of A1C Holdings, because Steven King is a resident and citizen of the State of Florida.  Upon information and belief, Steven King also operates, conducts, and engages in business in the State of Florida for his personal pecuniary benefit or profit.

19.     The Court has personal jurisdiction over James Letko, who, upon information and belief, was the Chief Executive Officer ("CEO") of A1C Holdings.  Upon information and belief, James Letko operates, conducts, and engages in business in the State of Florida for his personal pecuniary benefit or profit.

20.     The Court has personal jurisdiction over Katherine Peterson, who, upon information and belief was the Operations Supervisor for AAMS.  Upon information and belief, Katherine Peterson operates, conducts, and engages in business in the State of Florida for her personal pecuniary benefit or profit.

21.     Venue is proper in the United States District Court of the Southern District of Florida pursuant to 28 U.S.C. § 1391 because A1C Holdings and King are residents of this district.

22.     Venue is proper in the United States District Court of the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district.

## RELEVANT ENTITIES AND INDIVIDUALS

23.     Upon information and belief, at all relevant times, non-party AAMS was a Florida limited liability company and a subsidiary of A1C Holdings.

24.     Upon information and belief, at all relevant times, non-party Great Lakes Pharmacy d/b/a All American Medical Pharmacy ("AAMP") was a Michigan limited liability company and a subsidiary of A1C Holdings.

25.     Upon information and belief, at all relevant times, non-party Heartland Medical, LLC ("Heartland") was a Kansas limited liability company and a subsidiary of A1C Holdings.

26.     Upon information and belief, at all relevant times, non-party Heart of America, LLC ("Heart of America"), was a Missouri limited liability company and a subsidiary of A1C Holdings.

27.     Upon information and belief, at all relevant times, non-party Hudgins Pharmacy Inc. ("Hudgins") was a Virginia corporation and a subsidiary of A1C Holdings.

28.     Upon information and belief, at all relevant times, non-party Beta Discount Pharmacy and Health Services, LLC ("Beta") was a Georgia limited liability company and a subsidiary of A1C Holdings.

29.     Upon information and belief, at all relevant times, non-party Big Bend Pharmacy, LLC ("Big Bend") was a Tennessee limited liability company and a subsidiary of A1C Holdings.

30.     Upon information and belief, at all relevant times, non-party HCP Pharmacy, LLC d/b/a Steeplechase ("Steeplechase") was a Texas limited liability company and a subsidiary of A1C Holdings.

31.     Upon information and belief, at all relevant times, non-party Global Healthcare Management ("Global Healthcare") was a New Jersey limited liability company.  Upon information and belief, at all relevant times, Global Healthcare was not a subsidiary of A1C Holdings.

32.     Upon information and belief, at all relevant times, Defendant James Letko was the CEO of A1C Holdings.

33.     Upon information and belief, at all relevant times, Defendant Steven King was the CCO of A1C

34.     Upon information and belief, at all relevant times, Defendant Katherine Peterson was the Operations Supervisor for AAMS.

35.     Upon information and belief, at all relevant times, non-party Rami Lazeki was the pharmacist in charge ("PIC") at AAMP.

36.     Upon information and belief, at all relevant times, non-party Patricia Flannery was an employee of Global Healthcare.  Upon information and belief, at all relevant times, Flannery was not an employee of A1C Holdings.

## THE MAIC POLICY

37.     MAIC issued the Policy to A1C Holdings on a **Claim**s made basis for the period March 25, 2017 to April 11, 2018 (the "**Policy Period**").  The Policy includes the following Coverage Parts: (1) Directors and Officers and Company Liability (Coverage Part A.); and (2) and Employment Practices and Third Party Discrimination Liability (Coverage Part B.).  A copy of the Policy is attached hereto as Exhibit A.

38.     SECTION V. – REPORTING AND NOTICE, B. DISCOVERY OF POTENTIAL CLAIMS, of the Policy ("Discovery of Potential **Claim** Provision") and C. NOTICE, provides as follows:

**B. DISCOVERY OF POTENTIAL CLAIMS**

With respect to any purchased Coverage Part, if during the **Policy Period** or the **Extended Reporting Period**, if exercised, the **Insured** becomes aware of any circumstance that could give rise to a **Claim** against the **Insured** and gives written notice of such

circumstance containing the information listed below to the Insurer during the **Policy Period** or the **Extended Reporting Period**, if exercised, then any **Claim** subsequently arising therefrom shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is received by the Insurer.

It is a condition precedent to the coverage afforded by this SECTION V B. that such written notice to the Insurer contain the following information:

1**.**      A description and date of the **Wrongful Act** which could be alleged in the potential **Claim**;

2.      The injury or damage which has or may result from such **Wrongful Act**;

3.      The identity of the **Insureds** who may be the subject of the potential **Claim**;

4.      The identity of potential claimants; and

5.      The manner and time in which the **Insureds** first became aware of such circumstance or **Wrongful Act**. The Insurer, at its sole option, may investigate such circumstance or **Wrongful Act**.

**C. NOTICE**

Any notice to the Insurer pursuant to this SECTION V shall designate under which Coverage Part(s) the notice is given, and such notice shall not be deemed to be an effective notice under any other Coverage Part(s). Except as otherwise provided in this policy, all notices to the Insurer shall be in writing and given to the Insurer at the applicable address stated in Item 10. of the Declarations. All notices to the **Insureds** may be given to the **Parent Company** at the address stated in Item 1. of the Declarations.

(Ex. A).

39.      The Insuring Agreement in Section I. of Coverage Part A. of the Policy provides,

in relevant part:

**A.      INSURED PERSON LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become

legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

B.     **COMPANY REIMBURSEMENT COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** for which the **Company** grants indemnification to the **Insured Persons**, as permitted or required by law, and which the **Insured Persons** have become legally obligated to pay on account of any **Claim** first made against **Insured Persons**, individually or otherwise, during the **Policy Period** or any applicable **Extended Reporting Period**, if purchased, for a **Wrongful Act** taking place before or during the **Policy Period**.

C.     **COMPANY LIABILITY COVERAGE**

The Insurer shall pay on behalf of the **Company** all **Loss** which the **Company** becomes legally obligated to pay on account of any **Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**.

(Ex. A).

40.     Section II – DEFINITIONS, C. of the Policy's General Terms and Conditions

defines **Claim Expenses** to mean:

[R]easonable and necessary fees, costs and expenses incurred by:

1.     The Insurer, if duty to defend coverage has been purchased for the applicable Coverage Part;

2.     The **Insureds**, if duty to defend coverage has not been purchased for the applicable Coverage Part;

In the defense or appeal of that portion of any **Claim** for which coverage is afforded under this policy, including without limitation court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Insurer to apply for or furnish any such bonds; provided, however, that **Claim Expenses** shall not include salary, wages, overhead, benefit expenses or charges of any kind associated with **Insured Person**s or the Insurer.

(Ex. A).

41.     Section III – DEFINITIONS, B. of Coverage Part A defines **Claim** as follows:

1.      A written demand against an **Insured** for monetary damages or non-monetary relief, including a written demand that an **Insured** toll or waive a statute of limitations, commenced by such **Insured's** receipt of such written demand;

2.      A civil proceeding against an **Insured** commenced by the service of a complaint or similar pleading upon such **Insured**;

3.      A criminal proceeding against an **Insured** commenced by such **Insured's** receipt of an indictment, information or similar document;

4.      An administrative or regulatory proceeding against an **Insured** commenced by such **Insured's** receipt of a notice of charges or similar document;

5.      A civil, criminal, administrative or regulatory investigation of an **Insured Person** commenced by the service upon or other receipt by such **Insured Person** of a target letter or other written notice from the investigating authority identifying by name such **Insured Person** as an individual against whom a proceeding may be commenced;

6.      An official request for the **Extradition** of an **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of Extradition, commenced by such receipt of such **Insured Person's** request or warrant; or

7.      An arbitration, mediation or other alternative dispute resolution proceeding against an **Insured** commenced by such **Insured's** receipt of a demand for such a proceeding;

For a **Wrongful Act**, including any appeal therefrom.

8.      Solely with respect to INSURING AGREEMENTS A. and subject to SECTION II D., **Claim** also means any request, demand or subpoena by a regulatory, administrative, governmental or similar authority to interview or depose an **Insured Person**, or to produce documents by an **Insured**

**Person**, in his or her capacity as such commenced by such receipt of such a request, demand or subpoena; or

9.      Solely with respect to INSURING AGREEMENTS D., **Claim** only means a **Securityholder Derivative Demand**.

(Ex. A).

42.     Section III – DEFINITIONS, N. of Coverage Part A. of the Policy defines

**Wrongful Act** to mean:

1.      Any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by any **Insured Person** in their capacity as such or in an **Outside Position**, or with respect to Insuring Agreement C, by the **Company**; or

2.      Any matter claimed against any **Insured Person** solely by reason of their serving in such capacity or in an **Outside Position**.

(Ex. A).

43.     Section III – DEFINITIONS, G. of Coverage Part A. of the Policy defines

**Insured**, whether in the singular or plural, to mean: "the **Insured Persons** and, solely with

respect to INSURING AGREEMENTS B., INSURING AGREEMENTS C. AND INSURING

AGREEMENTS D., the **Company**."  (Ex. A).

44.     Section III – DEFINITIONS, F. of Coverage Part A. of the Policy defines

**Insured Person**, whether in the singular or plural, to mean:

1.      Any natural person who was, now is or shall during the **Policy Period** become a duly elected or appointed director, trustee, governor, **Manager**, officer, advisory director, or member of a duly constituted committee or board of the **Company** or their functional equivalent;

2.      Any natural person not described in Item 1. above who was, now is or shall during the **Policy Period** become an **Employee** of the **Company**; and

3.      Any natural person described in Item 1. above while serving in an **Outside Position**;

> Provided that an **Employee** described in Item 2. above shall not be considered an **Insured Person** for purposes of SECTION II B., OUTSIDE POSITION COVERAGE, of this Coverage Part and EXCLUSIONS C. or D. in SECTION IV of this Coverage Part.

(Ex. A).

45.    Section II – DEFINITIONS, D. of the Policy's General Terms and Conditions

provides defines **Company** to mean, collectively:

> [T]he **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

(Ex. A).

46.    Section II – DEFINITIONS, G. of the Policy's General Terms and Conditions

defines **Employee** to mean:

> 1.    Any natural person in the regular service of the **Company** in the ordinary course of the **Company's** business and whom the **Company** compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service, including any such natural person who is a leased, temporary, parttime or seasonal employee or intern of the **Company**;
>
> 2.    Any natural person independent contractor who is treated under applicable law as an employee of the **Company**;
>
> 3.    Any **Volunteer** of the **Company**; and
>
> 4.    Solely with respect to the coverage afforded under the EMPLOYMENT PRACTICES AND THIRD PARTY DISCRIMINATION LIABILITY COVERAGE PART, provided such Coverage Part is purchased and attached to this policy, any applicant for employment with the **Company**.

(Ex. A).

47.    Section II – DEFINITIONS, I. of the Policy's General Terms and Conditions

defines **Executive Officer** to mean "with respect to any **Company**, any natural person who was,

now is or shall during the **Policy Period** become such **Company's** president, chief executive

14

officer, chief operating officer, chief financial officer or in-house general counsel or the functional equivalent of any of the foregoing positions." (Ex. A).

48. Section II – DEFINITIONS, T. of the Policy's General Terms and Conditions defines **Parent Company** to mean "the organization stated in Item 1. of the Declarations" of the Policy. (Ex. A).

49. Section II – DEFINITIONS, R. of the Policy's General Terms and Conditions defines **Manager** to mean "with respect to any **Company** that is a limited liability company, any natural person who was, now is or shall during the **Policy Period** become such **Company's** manager, managing member, member of the board of managers or equivalent executive." (Ex. A).

50. Section II – DEFINITIONS, CC. of the Policy's General Terms and Conditions defines **Subsidiary** to mean:

1. Any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position is owned, in any combination, by one or more other **Company(ies)**;

2. Any organization in which one or more other **Company(ies),** in any combination, have the right, pursuant to a written contract with or the by-laws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors or equivalent position of such organization;

3. Any foundation, charitable trust or political action committee controlled or exclusively sponsored by one or more other **Company(ies)**; and

4. Any organization operated as a joint venture in which, on or prior to the inception date stated in Item 2. of the Declarations, the **Parent Company** owns, directly or through one or more **Subsidiaries**, exactly fifty percent (50%) of the organization's outstanding securities and voting rights and, under a written agreement with the

15

organization's remaining owners, has sole control of organizations management and operations.

(Ex. A).

51.     The Policy's endorsement, titled The Exclusion – Broad Professional Liability

Endorsement (the "Professional Services Exclusion") modifies Coverage Parts A. and B. of the

Policy and provides as follows:

>    1.     With respect to the above marked Coverage Part(s), SECTION – EXCLUSIONS is amended by the addition of the following exclusion:
>
>    The Insurer shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any involving any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services.
>
>    This exclusion shall not apply to any **Insured Person** against whom a **Claim** is made alleging such **Insured Person** failed to supervise the rendering of or failure to render any professional services excluded above.  However, the Insurer's liability for **Loss** for such covered **Claim** shall be limited to **Loss** arising from the failure to supervise the rendering of or failure to render professional services only.
>
>    3.     DIRECTORS AND OFFICERS LIABILITY COVERAGE PART SECTION – EXCLUSIONS L.4. is deleted.

(Ex. A).

52.     Section IV – EXCLUSIONS, I.  of Coverage Part A. of the Policy ("Exclusion

I.") provides that the Insurer shall not be liable under this Coverage Part to pay any **Loss** on

account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

>    Based upon, arising out of or in any way involving any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such a deliberately fraudulent act or omission or willful violation[.]

(Ex. A).

53.     Section IV – EXCLUSIONS, J.  of Coverage Part A. of the Policy ("Exclusion J.") provides that the Insurer shall not be liable under this Coverage Part to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

> Based upon, arising out of or in any way involving such **Insured Person** gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if (i) a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such **Insured** in fact gained any such profit, remuneration or advantage, or (ii) such **Insured** agrees to repay to the **Company** such profit, remuneration or financial advantage[.]

(Ex. A).

54.     Section IV – EXCLUSIONS, L.6.  of Coverage Part A. of the Policy provides that, solely with respect to Insuring Agreement C., the Insurer shall not be liable under this Coverage Part to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

> Based upon, arising out of or in any way involving the actual or alleged malfunction, defect or failure of any goods or products manufactured, distributed, sold, installed, marketed, developed or processed by the **Company**; provided this exclusion shall not apply to any **Claim** by one or more securityholders of the **Company** in their capacity as such[.]

(Ex. A).

## RELEVANT BACKGROUND

### I.     The Search and Seizure Warrants

55.     On May 2, 2017 and May 3, 2017, federal judges sitting in the U.S. District Court for the Eastern District of Michigan and the Southern District of Florida, authorized federal agents to search and seize property and bank accounts from/owned by AAMP and AAMS, and other possible subsidiaries of A1C Holdings (the "Search and Seizure Warrants").

17

56.     An affidavit in support of the application for the seizure warrants was completed by Andrew F. Crump, Special Agent for the F.B.I. (the "Crump Affidavit").   The Crump Affidavit alleges that AAMP engaged in multiple mechanisms to defraud Medicare Part D and alleges that AAMP: (1) used a related business entity to solicit non-client Medicare beneficiaries to use high reimbursement drugs, such as lidocaine; (2) sent medication, namely lidocaine, to beneficiaries without their permission and dispensed medically unnecessary medication without valid prescriptions; and (3) fraudulently used physicians' national provider numbers ("NPI") to facilitate their Medicare claims.  Mr. Crump alleges that Medicare paid AAMP approximately $49.2 million and that certain bank accounts were used in connection with money laundering and are thus subject to civil forfeiture.

57.     On May 30, 2017, A1C Holdings provided MAIC with written notice of the Search and Seizure Warrants.

58.     On May 30, 2017, MAIC acknowledged receipt of the Search and Seizure Warrants as "notice of a potential claim."

59.     In or around September 2017, A1C Holdings' counsel contacted MAIC to inquire whether coverage could be available for the Search and Seizure Warrants as a **Claim** under the Policy.

60.     In or around September 2017, MAIC communicated to A1C Holdings' counsel that the Search and Seizure Warrants do not constitute a **Claim** under the Policy and that MAIC accepted the Search and Seizure Warrants as notice of a potential **Claim**.

61.     In response, by letter dated October 17, 2017, from A1C Holdings' counsel to MAIC's counsel, the **Insureds** stated that they believed that the Search and Seizure Warrants

18

reflect an ongoing criminal investigation and are sufficient to satisfy the definition of a covered **Claim** under the Policy.

62.    By letter dated November 28, 2017, MAIC issued a letter denying coverage for the Search and Seizure Warrants and the Civil Forfeiture Complaint, discussed below, on the basis that the Search and Seizure Warrants and the Civil Forfeiture Complaint do no constitute **Claim**s under the Policy.

63.    With respect to the Search and Seizure Warrants, MAIC concluded that the Search and Seizure Warrants do not constitute a **Claim** under Section III.N.5 of Coverage Part A. of the Policy.  Specifically, the captions of the Search and Seizure Warrants do not identify an **Insured Person** and the Search and Seizure Warrants were not served upon James Letko, Jeffrey Kolmer, Steven King, or any other **Insured Person** as an individual against whom a proceeding may be commenced.

64.    MAIC reserved all rights, remedies, and defenses under the Policy and applicable law in the November 28, 2017 letter.

65.    MAIC accepted the Search and Seizure Warrants as written notice of "circumstances that could give rise to a **Claim** against the **Insured**" in accordance with the Discovery of Potential Claim Provision in the Policy. (Ex. A).

**II.    The Civil Forfeiture Complaint**

66.    On September 29, 2017, a civil forfeiture complaint was filed in the U.S. District Court for the Eastern District of Michigan, Southern Division, styled *United States of America v. Forty-Eight Thousand Seven Hundred Forty-Five Dollars and Thirty-Six Cents ($48,745.36) in U.S. Currency from Signature Bank Account #XXXXXX3157, Four Hundred Twenty-One Thousand Two Hundred Fifty-Nine Dollars and Twenty-Six Cents ($421,259.26) in U.S.*

*Currency from Signature Bank Account #XXXXXX6003, Nineteen Thousand One Hundred*

*Eighty-Four Dollars and Ninety-Five Cents ($19,184.95) in U.S. Currency from TD Bank*

*Account #XXXXXX8319, Ninety-Seven Thousand Five Hundred Thirty-Nine Dollars and Three*

*Cents ($97,539.03) in U.S. Currency from Signature Bank Account #XXXXXX3045, One*

*Hundred Sixty-Five Thousand Nine Hundred Sixteen Dollars and Ninety-Five Cents*

*($165,916.95) in U.S. Currency from TD Bank Account #XXXXXX9424, One Hundred Twenty-*

*Five Thousand Eighty Hundred Sixty-Five Dollars and Seven Cents ($125,865.07) in U.S.*

*Currency from Signature Bank Account #XXXXXX6011, Seven Hundred Thirteen Dollars and*

*Seventy-Five Cents ($713.75) in U.S. Currency from TD Bank Account #XXXXXX8327, Thirteen*

*Thousand Four Hundred Seventy-Nine Dollars and Seven Cents ($13,479.07) in U.S. Currency*

*from TD Bank Account #XXXXXX7357, Three Hundred Seventy-Eight Thousand Five Hundred*

*Fifty-Four Dollars and Sixty-Five Cents ($378,554.65) in U.S. Currency from TD Bank Account*

*#XXXXXX7349, Twenty-Four Thousand Six Hundred Sixty-Eight Dollars and Four Cents*

*($24,668.04) in U.S. Currency from Signature Bank Account #XXXXXX5147* (the "Civil

Forfeiture Complaint").

  67. The Civil Forfeiture Complaint alleges that the defendants *in rem* constitute the

proceeds of health care fraud and were subsequently involved in money laundering.  The Civil

Forfeiture Complaint alleges that James Letko and co-conspirators Jon Letko, Edward Letko,

Steven King, Jeffrey Kolmer, and others, doing business as AAMP and affiliated entities,

engaged in healthcare fraud and derived millions of dollars in proceeds from that illegal

activity.  Specifically,  AAMP: (1) used a related business entity to solicit non-client Medicare

beneficiaries to use high reimbursement drugs, such as lidocaine; (2) sent medication, namely

lidocaine, to beneficiaries without their permission and dispensed medically unnecessary

medication without valid prescriptions; and (3) fraudulently used physicians' NPI to facilitate their Medicare claims.

68.     On October 3, 2017, A1C Holdings provided MAIC with written notice of the Civil Forfeiture Complaint.

69.     By letter dated November 28, 2017, MAIC issued a letter denying coverage for the Search and Seizure Warrants and the Civil Forfeiture Complaint on the basis that the Search and Seizure Warrants and the Civil Forfeiture Complaint do no constitute **Claims** under the Policy.

70.     With respect to the Civil Forfeiture Complaint, MAIC concluded that the Civil Forfeiture Complaint is not a **Claim** made against the **Company** pursuant to Section I. of Coverage Part A. of the Policy.  Specifically, the Civil Forfeiture Complaint does not name the **Insured** or **Insured Persons** as defendants but names various bank accounts as defendants *in rem*.  The bank accounts do not qualify as **Insureds**, as that term is defined in the Policy. Accordingly, MAIC concluded that the Civil Forfeiture Complaint is not a **Claim** first made against the **Insured**.

71.     MAIC reserved all rights, remedies, and defenses under the Policy and applicable law in the November 28, 2017 letter.

**III.     The Order Summaries**

72.     On September 19, 2017, the North Carolina Board of Pharmacy issued order summaries suspending the pharmacy permits for AAMP, AAMS, and Saracare LLC d/b/a All-American Medical ("Saracare") (collectively referred to as the "Order Summaries").

73.     The Order Summaries ordered that AAMP immediately cease any practice of pharmacy in North Carolina pending issuance of a "Final Agency Decision."

74.     The Order Summaries ordered that Saracare and AAMS immediately cease supplying devices and medical equipment in North Carolina pending issuance of a Final Agency Decision.

75.     On October 23, 2017, the **Insured** provided MAIC with written notice of the Order Summaries.

76.     By letter dated May 24, 2018, MAIC denied coverage for the Order Summaries on the basis that the Order Summaries neither constitute a **Claim** under Section III.N.4 of Coverage Part A. nor Section III.N.5 of Coverage Part A. of the Policy.

77.     With respect to Section III.N.4. of the Policy, MAIC concluded that the Order Summaries were issued as an "emergency action" in the course of an investigation and are not "administrative or regulatory proceeding[s] against an **Insured** commenced by such **Insured's** receipt of a notice of charges or similar document."

78.     With respect to Section III.N.5 f the Policy, MAIC concluded that the Order Summaries do not constitute a "civil, criminal, administrative or regulatory investigation of an **Insured Person**" because the Order Summaries do not identity any **Insured Person** and the Order Summaries were not served upon an **Insured Person** as an individual against whom a proceeding may be commenced.

79.     MAIC reserved all rights, remedies, and defenses under the Policy and applicable law in the May 24, 2018 letter, including the right to deny coverage pursuant to the Professional Services Exclusion.

**IV.     The Target Letters**

80.     On December 4, 2018, A1C Holdings provided written notice of a target letter issued by the USDOJ to Steven King.

81.     On January 8, 2019, A1C Holdings provided written notice of target letters issued by the USDOJ to Katherine Peterson and Emanuel Holmes.

82.     On February 12, 2019, A1C Holdings provided written notice of a target letter issued by the USDOJ to Leah Moyer.

83.     On July 11, 2019, A1C Holdings provided written notice of a target letter issued by the USDOJ to James Letko.

84.     MAIC concluded that Steven King, Emanuel Holmes, Katherine Peterson, and James Letko qualify as **Insured Persons**, as that term is defined in the Policy, and accepted the Target Letters as a **Claim** under the Policy.  MAIC provided a defense to Steven King, Emanuel Holmes, Katherine Peterson, and James Letko in connection with the Target Letters, subject to a reservation of rights.

85.     MAIC did not accept the target letter addressed to Leah Moyer as a **Claim** on the basis that Leah Moyer is not an **Insured Person**.  Specifically, upon information and belief, Leah Moyer was an employee of Global Healthcare – which is not a **Subsidiary** of A1C Holdings.

**V.      The Indictment**

86.     On September 26, 2019, a grand jury in the U.S. District Court of the Eastern District of Michigan, Southern Division, indicted the following individuals (the "Indictment"): (1) James Letko; (2) Steven King; (3) Rami Lazeki; (4) Patricia Flannery; and (5) Katherine Peterson (collectively referred to herein as the "Criminal Defendants"). The Indictment charges all Criminal Defendants with Count 1: Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349, and charges Rami Lazeki with Counts 2-6: Health Care

Fraud, in violation of 18 U.S.C. §§ 1347 and 2.  A copy of the Indictment is attached herein as Exhibit B.

87.     With respect to Count 1, the Indictment alleges, among other things, that in or around the end of 2013 and continuing through to 2018, the Criminal Defendants willfully and knowingly conspired to execute a scheme to defraud health care benefit programs, specifically the Medicare Part D Program.  Specifically, the Criminal Defendants allegedly submitted false and fraudulent claims to Medicare and Medicare drug plan sponsors on behalf of the following pharmacies: (1) AAMP; (2) Heartland; (3) Heart of America; (4) Hudgins; (5) Beta; (6) Big Bend; and (7) Steeplechase (collectively referred to as the "A1C Pharmacies"). (Ex B.)

88.     The Indictment also alleges, among other things, that the Criminal Defendants: (1) knowingly and willfully executed a scheme to defraud Medicare and Medicare drug plan sponsors by means of, among other things,  "materially false and fraudulent pretenses…in connection with the delivery of and payment for health care benefits, items and service[.]" (*See* Ex B., Indictment, ¶ 25(a)); (2) refilled medically unnecessary prescription drugs and diabetic testing supplies that were shipped without patient consent. *Id.* at ¶ 35; (3) redirected prescriptions without patient consent *Id.* at ¶ 36; and (4) did not collect co-pays from Medicare beneficiaries in order to induce them to accept refills of expensive medication and diabetic testing supplies without consent *Id.* at ¶ 37.

89.     With respect to Counts 2-6, the Indictment alleges, among other things, that Rami Lazeki did knowingly and willfully execute and attempt to execute a scheme to defraud a health care benefit program by submitting or causing the submission of false and fraudulent claims to the Medicare Program and Medicare drug plan sponsors for prescription medications and diabetic testing supplies that were not medically necessary. (Ex. B)

90.     The Indictment also sets forth criminal forfeiture of certain property and seeks a forfeiture money judgment from the Criminal Defendants for a sum of money representing the total amount of proceeds obtained in violation of Section 18 U.S.C. §§ 1347 and 1349. (Ex. B).

91.     On September 27, 2019, A1C Holdings provided MAIC with written notice of the Indictment.

92.     In or around September and October 2019, MAIC informed A1C Holdings' counsel that in light of the allegations in the Indictment, MAIC is evaluating coverage for the Indictment under the Policy.  Specifically, MAIC informed A1C Holdings' counsel that coverage may be excluded pursuant to the Professional Services Exclusion.

93.     In or around September and October 2019, MAIC informed counsel for the **Insured Persons** that given the allegations in the Indictment, MAIC is evaluating the availability of coverage for the Indictment under the Policy.

94.     On or about October 29, 2019, MAIC's counsel communicated to A1C Holdings' counsel that MAIC will be issuing a letter denying coverage for the Indictment pursuant to, among other things, the Professional Services Exclusion.

95.     In response, by letter dated October 30, 2019, from A1C Holdings' counsel to MAIC's counsel, the **Insureds** objected to MAIC's position that coverage for the Indictment is excluded pursuant to the Professional Services Exclusion.

96.     By letter dated November 1, 2019, MAIC issued a letter denying coverage for the Indictment on the basis that it is excluded pursuant to the Professional Services Exclusion.

97.     MAIC concluded that the Indictment is based upon and arises out of actual or alleged errors, misstatements, misleading statements, acts, omissions, neglect, or breach of duty

25

in connection with the rendering or failure to render professional services, including the dispensing of medicinal drugs and testing supplies.

98.     In MAIC's November 1, 2019 letter, MAIC stated that it will continue to defend the **Insureds** named in the Indictment under a reservation of rights pending resolution of the coverage dispute.

99.     In MAIC's November 1, 2019 letter, MAIC stated that MAIC's funding of **Claim Expenses** is subject to the reservation of rights and the right to withdraw its defense and seek reimbursement from the **Insureds** the full amount of **Claim Expenses** funded by MAIC in the event MAIC obtains a determination from a court of competent jurisdiction that the Policy provides no coverage for this matter.

**RQUEST FOR DECLARATORY JUDGMENT**

100.    In this action, MAIC seeks a declaration that it has no duty to defend and no duty to indemnify the Defendants in connection with the Indictment based upon: (1) the Professional Services Exclusion; (2) Exclusion I.; and (3) Exclusion J.

101.    In this action, MAIC seeks reimbursement from each of the Defendants of the full amount of **Claim Expenses** funded by MAIC in connection with the Indictment.

**COUNT I – DECLARATORY JUDGMENT**
**(Professional Services Exclusion)**

102.    MAIC repeats and realleges Paragraphs 1 through 101 above as if fully set forth herein.

103.    Pursuant to the Professional Services Exclusion, MAIC shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving "any actual or alleged error, misstatement, misleading statement, act,

26

omission, neglect, or breach of duty in connection with the rendering or failure to render any professional services." (Ex. A).

104.     The allegations in the Indictment are based upon, arise out of, and/or involve actual or alleged errors, misstatements, misleading statements, acts, omissions, neglect, or breach of duty in connection with the rendering or failure to render any professional services.

105.     The allegations in the Indictment are based upon and arise out of professional services because the Indictment flows from and has a connection with the defendants and related pharmacists/pharmacies dispensing medicinal drugs and testing supplies to Medicare beneficiary patients.

106.     Based on the foregoing, there is no coverage for the Indictment pursuant to Professional Services Exclusion.

107.     MAIC therefore has no duty to defend or indemnify the Defendants and/or any other **Insured Person**s in connection with the Indictment.

<u>**COUNT II – DECLARATORY JUDGMENT**</u>
**(Exclusion I.)**

108.     MAIC repeats and realleges Paragraphs 1 through 101 above as if fully set forth herein.

109.     Pursuant to Exclusion I. in the Policy, MAIC shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any involving "any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such a deliberately fraudulent act or omission or willful violation[.]" (Ex. A).

110.    Count 1 in the Indictment charges **Insured Person**s with Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349.

111.    Count 2-6 in the Indictment charges an **Insured Person** with Health Care Fraud, in violation of 18 U.S.C. §§ 1347.

112.    The Indictment alleges, among other things, that **Insured Person**s submitted false and fraudulent claims to Medicare and Medicare drug plan sponsors on behalf of A1C Pharmacies.

113.    Based on the foregoing, the allegations in the Indictment are based upon, arise out of, and/or involve deliberate fraudulent acts or omissions or willful violations of any statute or regulation committed by the **Insured**.

114.    Because the allegations in the Indictment are based upon, arise out of, and/or involve deliberate fraudulent acts or omissions or willful violations of any statute or regulation committed by the **Insured**, Exclusion I. operates to exclude coverage for the Indictment if a final and non-appealable adjudication adverse to such **Insured** in the Indictment or in any proceeding not brought by the Insurer establishes such deliberately fraudulent act or omission or willful violation.

115.    In the event Exclusion I. is triggered by a final and non-appealable adjudication adverse to such **Insured** in the Indictment or by any proceeding not brought by the Insurer establishing such deliberately fraudulent act or omission or willful violation, MAIC will have no duty to defend or indemnify the Defendants and/or any other **Insured Person**s in connection with the Indictment.

## COUNT III – DECLARATORY JUDGMENT
### (Exclusion J.)

116.    MAIC repeats and realleges Paragraphs 1 through 101 above as if fully set forth herein.

117.    Pursuant to Exclusion J. in the Policy, MAIC shall not be liable to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of, or in any way involving any involving an **Insured Person** "gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if: (i) a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such **Insured** in fact gained any such profit, remuneration or advantage; or (ii) such **Insured** agrees to repay the **Company** such profit, remuneration or financial advantage." (Ex. A).

118.    The Indictment alleges that one of the purposes of conspiracy to commit heath care fraud was to unlawfully enrich themselves and others by, among other things, diverting fraud proceeds for the personal use and benefit of the defendant and others.

119.    The Indictment alleges that the defendants and others submitted, and caused the submission of, false and fraudulent claims to Medicare and Medicare drug plan sponsors, via interstate wires, and on behalf of the A1C Pharmacies, in amount exceeding $80 million. (Ex. A, Compl. ¶ 38).

120.    The Indictment alleges that upon conviction of a violation alleged in the Indictment, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds and/or gross proceeds traceable to the commission of such violations, pursuant to 18 U.S.C. § 982(a)(7) and 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461. (Ex. A, Compl. ¶ 45).

29

121.    The Indictment seeks a forfeiture money judgment from the defendants for a sum of money representing the total amount of proceeds obtained in violation of Section 18 U.S.C. §§ 1347 and 1349. ((Ex. A, Compl. ¶ 47).

122.    Based on the foregoing, the allegations in the Indictment are based upon, arise out of, and/or involve an **Insured Person** gaining a profit, remuneration or financial advantage to which such **Insured** was not legally entitled.

123.    Because the allegations in the Indictment are based upon, arise out of, and/or involve an **Insured Person** gaining a profit, remuneration or financial advantage to which such **Insured** was not legally entitled, Exclusion I. operates to exclude coverage for the Indictment if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such **Insured** in fact gained any such profit, remuneration or advantage.

124.    Because the allegations in the Indictment are based upon, arise out of, and/or involve an **Insured Person** gaining a profit, remuneration or financial advantage to which such **Insured** was not legally entitled, Exclusion I. operates to exclude coverage for the Indictment if such **Insured** agrees to repay the **Company** such profit, remuneration or financial advantage.

125.    In the event Exclusion I. is triggered by a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Insurer establishes such **Insured** in fact gained any such profit, remuneration or advantage or because such **Insured** agrees to repay the **Company** such profit, remuneration or financial advantage, MAIC will have no duty to defend or indemnify the Defendants and/or any other **Insured Person**s in connection with the Indictment.

## COUNT IV – DECLARATORY JUDGMENT
### (Reimbursement)

126.    MAIC repeats and realleges Paragraphs 1 through 101 above as if fully set forth herein.

127.    MAIC is entitled to recoupment and/or reimbursement from each of the Defendants of the full amount of **Claim Expenses** funded by MAIC in defense of the Indictment.

128.    MAIC funded each of the Defendants' **Claim Expenses** in defense of the Target Letters issued to Steven King, Emanuel Holmes, Katherine Peterson, and James Letko.

129.    MAIC funded each of the Defendants **Claim Expenses** in defense of the Indictment, subject to a full reservation of rights, including MAIC's right to seek recoupment from the Defendants of the full amount of **Claim Expenses** funded by MAIC in connection with the Indictment.

130.    In the event this Court adjudges and declares that MAIC has no duty to defend or indemnify the Defendants in connection with the Indictment, MAIC is entitled to recoupment and/or reimbursement from each of the Defendants of the full amount of **Claim Expenses** funded by MAIC in connection with the Indictment.

**WHEREFORE**, MAIC respectfully prays that this Court enter an order:

a)      Declaring that MAIC has no duty to defend the Defendants in connection with the Indictment;

b)      Declaring that MAIC has no duty to indemnify the Defendants in connection with the Indictment;

c)      Declaring that MAIC is entitled to the reimbursement/recoupment of the full amount of **Claim Expenses** paid on behalf of each of the Defendants in connection with the Indictment;

d)      Awarding judgment in the amount paid by MAIC on behalf of the Defendants in defense of the Indictment as damages for **Claim Expenses**, including interest, fees, and such other and further amount the Court deems just and proper;

e)      Awarding costs, disbursements, and attorneys' fees; and

f)      For such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 25, 2019

                        Respectfully Submitted,

                        MORAN KIDD LYONS JOHNSON GARCIA, PA

                        By: /s/Christopher R. Parkinson
                        Christopher R. Parkinson, Esq.
                        Florida Bar No. 112114
                        111 North Orange Avenue, Suite 900
                        Post Office Box 472
                        Orlando, Florida 32802
                        407-841-4141 (telephone)
                        407-841-4148 (facsimile)
                        cparkinson@morankidd.com
                        eservice@morankidd.com

                        *Local Counsel for Plaintiff*

*Markel American Insurance Company*

TRESSLER LLP
Michael Delhagen, Esq.
Kiera Fitzpatrick, Esq.
One Penn Plaza, Suite 4701
New York, New York 10119
Tel: (646) 833-0900
mdelhagen@tresslerllp.com
kfitzpatrick@tresslerllp.com
*Pro Hac Vice Admission Pending*

*Attorneys for Plaintiff*
*Markel American Insurance Company*